UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X

JAMAL EUBANKS, as Administrator of
the Estate of JACE EUBANKS deceased,          **MEMORANDUM & ORDER**
J.E., an infant, by his father and
natural guardian JAMAL EUBANKS, and
JAMAL EUBANKS, in his individual              No. 22-cv-6277(KAM)(JRC)
capacity,

        Plaintiffs,

   - against -

DAVID HANSELL, former commissioner
of the New York City Administration
for Children's Services,
THE CITY OF NEW YORK, JOHN and JANE
DOES, and JOHN and JANE ROES,

        Defendants.

----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

    Plaintiffs Jamal Eubanks, as administrator of the estate of

Jace Eubanks (the "Decedent"); J.E., a minor, by his father and

guardian, Jamal Eubanks (the "Minor Son" and, together with the

Decedent, the "Children"); and Jamal Eubanks, in his individual

capacity ("Mr. Eubanks") (all together, "Plaintiffs") commenced

the instant action on October 18, 2022 in connection with the

tragic death of the Decedent.  (ECF No. 1, Complaint, "Compl.")

Defendants are the City of New York (the "City"); the former

Commissioner of the New York City Administration for Children's

Services ("ACS")[1], David Hansell ("Hansell"); the individuals affiliated with and representative of the New York City Police Department ("NYPD") who participated in the alleged incidents (the "Doe Defendants"); and the individuals affiliated with and representative of ACS who participated in the alleged incidents (the "Roe Defendants") (all together, "Defendants").

In the operative Amended Complaint (ECF No. 10, Amended Complaint, "AC"), Plaintiffs allege that, after receiving a report of suspected child abuse from the Children's daycare center, Defendants visited the Children's home where they resided with their mother, Rickia Duvalle ("Ms. Duvalle"), and her boyfriend, Jeremiah Johnson ("Mr. Johnson"), on August 26, 2021 and August 29, 2021.  Plaintiffs allege that Defendants observed signs pf physical injuries on the Children's bodies, questioned their mother and Mr. Johnson, and permitted the Children to remain in the care of their mother and Mr. Johnson, despite learning of Mr. Johnson's history of child abuse and his outstanding warrant, and despite observing, from the Children's injuries, that they were at serious risk of future abuse.  (AC ¶¶ 34-52.)  Defendants allegedly promised the Children that they

---

[1] Plaintiffs named ACS as a defendant in their Amended Complaint, but stated in their opposition brief that they "do not contest the dismissal of ACS as a named defendant."  (Ptf. Opp. at 22 n.37.)  Accordingly, pursuant to Federal Rule of Civil Procedure 41(a)(2) and pursuant to Plaintiffs' request, the Amended Complaint is dismissed as against ACS.

would protect them and, according to Plaintiffs, implicitly communicated to Mr. Johnson that his abuse of the Children would not be punished.  (AC ¶ 53.)  On September 12, 2021, the Decedent succumbed to severe physical injuries inflicted upon him by Mr. Johnson.  Mr. Johnson was subsequently charged with the murder of the Decedent.  Plaintiffs do not allege that Defendants were informed, prior to the Decedent's murder, that Mr. Johnson or the Children's mother inflicted injuries on the Children.

Plaintiffs allege that Defendants' failure to remove the Children from their dangerous home environment resulted in the death of the Decedent.  Specifically, Plaintiffs allege that Defendants' failure to safeguard the wellbeing of the Decedent and Minor Son by virtue of Defendants' inaction and affirmative conduct deprived Plaintiffs of their constitutional rights, including Plaintiffs' Due Process rights under the Fifth and Fourteenth Amendments, and Plaintiffs' rights under New York Social Services Law.  Plaintiffs further allege that, because Defendants acted under color of law and because Defendants' conduct was purportedly part of the City's policy of indifference and inaction in the face of child abuse, Defendants' inaction and affirmative conduct constitute violations of 42 U.S.C. § 1983 by individual municipal employees and the City.  Finally, Plaintiffs also allege claims under New

York state law, including wrongful death and negligence.

Presently before the Court is Defendants' motion to dismiss the Amended Complaint (ECF Nos. 13-2, "Def. Mot."; 15, "Def. Reply") pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs oppose Defendants' motion to dismiss the Amended Complaint.  (ECF No. 14, "Ptf. Opp.")  For the reasons set forth below, Defendants' motion to dismiss the Amended Complaint is **GRANTED** and Plaintiffs' Amened Complaint is **DISMISSED** without prejudice to refile in New York state court.

## BACKGROUND

### I.   Factual Background

Mr. Eubanks is the father of brothers, Jace Eubanks (the "Decedent") and J.E. (Mr. Eubanks's "Minor Son") (together, the "Children").  (AC ¶ 33.)  In August and September 2021, the Children lived with their mother, Ms. Duvalle, and her boyfriend, Mr. Johnson, in Brooklyn, New York.  (AC ¶ 34.)  At the time, the Decedent was approximately four years old and J.E. was approximately six years old.  (AC ¶¶ 17-18.)

According to the Amended Complaint, Mr. Johnson had a history of child abuse, including three reports over the course of four years charging him with committing acts of domestic violence and abusing children.  (AC ¶ 38.)  On August 26, 2021, Mr. Johnson was subject to an outstanding warrant for violating the conditions of his supervised release in connection with

charges of domestic violence "involving children."  (AC ¶ 39.)
Plaintiffs allege that Defendants were aware of these reports,
the outstanding warrant, and of Mr. Johnson's history of
violence towards children.  (AC ¶¶ 38-39.)

**A. The August 26, 2021 Incident**

On August 26, 2021, the Children attended Strong Place for
Hope Day Care Center in Brooklyn, New York.  (AC ¶ 35.)  On that
day, an employee of the Children's daycare center observed signs
of physical injury on the Children's bodies and called NYPD and
ACS authorities to report her suspicion that the Children were
being abused in their home.  (*Id.*)  The employee was a "Mandated
Reporter" under New York state law and called authorities
pursuant to her obligation to report any suspicions of child
abuse or neglect to the NYPD and/or ACS.  (*Id.*)

In response to the August 26, 2021 call from the Mandated
Reporter, the Doe and/or Roe Defendants visited the home of Ms.
Duvalle and Mr. Johnson to investigate the report of possible
child abuse.  (AC ¶ 36.)  The Doe and/or Roe Defendants
ultimately brought the Children, Ms. Duvalle, and Mr. Johnson to
the ACS office in Brooklyn, New York where Defendants conducted
interviews of the Children, Ms. Duvalle, and Mr. Johnson in
connection with the report of possible child abuse.

Plaintiffs allege that during the course of their
interviews, the Doe and/or Roe Defendants observed scars,

bruises, and other signs of physical injury on the Children's bodies, which indicated that the Children were being abused. (*Id.*)  Specifically, the Decedent appeared to have a black eye and numerous marks on his foot, the side of his rib, and on his chest that the Doe and/or Roe Defendants noted.  (Id.)  The Doe and/or Roe Defendants also questioned the Children, as well as Ms. Duvalle and Mr. Johnson, about the signs of physical injury, but there are no allegations that Defendants were provided with information that either Ms. Duvalle or Mr. Johnson had caused the Children's injuries. (*Id.*)  During their interviews, the Doe and/or Roe Defendants also learned that Mr. Johnson was subject to an outstanding warrant for violating the conditions of his supervised release in connection with charges of domestic violence "involving children."  (AC ¶ 39.)  While interviewing the Children, the Doe and/or Roe Defendants purportedly promised the Children "that they would protect them from harm, [that] they would be there to prevent any injuries . . . and [that] they would stop anyone, including Mr. Johnson, from injuring them in the future."  (AC ¶ 37.)  Plaintiff alleges that at the conclusion of the interviews, the Doe and/or Roe Defendants determined that the Children were "under suitable care" and permitted the Children to return to their home with Ms. Duvalle and Mr. Johnson.  (AC ¶ 43.)

**B. The August 29, 2021 Incident**

Three days after the initial home visit and ACS office interview, the Doe and/or Roe Defendants returned to the Children's residence to check in.  (AC ¶ 44.)  The Children, Ms. Duvalle, and Mr. Johnson were all present in the residence for the follow-up home visit.  (*Id*.)  Plaintiffs allege that the Doe and/or Roe Defendants again concluded that the Children were under suitable care and left the residence without further action.  (AC ¶ 45.)

**C. The Decedent's Death**

Plaintiffs allege that approximately two weeks later, on September 12, 2021, Mr. Johnson lifted the Decedent into the air and threw him down to the floor, which caused severe physical injuries and trauma, and to which the Decedent succumbed a short time later.  (AC ¶ 54.)  According to the Amended Complaint, the Decedent sustained blunt trauma to the torso and his cause of death was pronounced to be "Battered Child Syndrome."  (*Id*.) Mr. Johnson was arrested and subsequently charged with the murder of the Decedent.  (*Id*.)

**D. Applicable ACS Policy**

Plaintiff alleges that the Doe and/or Roe Defendants "concluded that the Children were in no danger" on both August 26, 2021 and August 29, 2021, and that their decision to leave the Children in the care of Ms. Duvalle and Mr. Johnson constituted a "violation of their own policies."  (AC ¶ 59.)

7

First, Plaintiffs allege that Defendants had an obligation to require that the Children visit a medical doctor to assess the extent of their observable injuries and to seek medical clearance before returning them to the care of Ms. Duvalle and Mr. Johnson.  (AC ¶ 65.)  Plaintiffs allege that if Defendants had arranged for the required medical care, X-ray results would have revealed what the Decedent's autopsy revealed—that the Decedent was suffering from fractures of his ribs, skull, and other parts of his body, and that he was a victim of Battered Child Syndrome.  (AC ¶¶ 66-67.)

Second, Plaintiffs allege that Defendants failed to interview the Children's neighbors, which, according to Plaintiffs, also constitutes a violation of ACS policy, and which may have revealed that the Decedent was a victim of Battered Child Syndrome.  (AC ¶ 69.)

Finally, Plaintiffs allege that Defendants failed to follow-up with Mr. Johnson with respect to his outstanding warrant and other complaints of child abuse.  (AC ¶ 73.)

**E. Defendants' Policy and Practice**

Notwithstanding the aforementioned policies, with which Defendants purportedly failed to comply on August 26, 2021 and August 29, 2021, Plaintiffs also allege that the City and ACS have a "policy, practice, and/or custom of . . . allowing vulnerable children to remain under the supervision of known

8

violent child predators" even when alerted of possible child abuse and in the face of visible signs of children's physical injuries.  (AC ¶ 85.)  Plaintiffs allege that, pursuant to this "policy, practice and/or custom," several other children have suffered from preventable deaths, including Julissia Batties, Legacy Beauford, Aisyn Gonzalez, Lisa Steinberg, Elisa Izguierdo, Daytwon Bennett, Sabrina Green, Marchella Brett-Prince, Kyron Hamilton, Nixzmary Brown, Sierra Roberts, Quachaun Brown, Myls Dobson, Sylena Herrenkind, Zymere Perkins, and Jaden Jordan, among others.  (AC ¶¶ 86-95.)

Following the deaths of Zymere Perkins and Jaden Jordan, the New York City Department of Investigation conducted an investigation into ACS and concluded that ACS is plagued by "systemic failures" and that "the City's response to complaints of child abuse" is hampered by "poorly trained staff and inadequate staffing in a unit that receives a high proportion of critical cases."  (AC ¶¶ 93-95.)

## II.  Procedural Background

Plaintiffs initiated this civil rights action, pursuant to 42 U.S.C. §1983, on October 18, 2022 by filing the original Complaint.  In response to Defendants' motion for a pre-motion conference in anticipation of Defendants' motion to dismiss the original Complaint, Plaintiffs sought leave to file an Amended Complaint.  (ECF No. 9 at 1-2.)  The Court granted Plaintiffs'

request for leave to file an Amended Complaint at the February 23, 2023 Pre-Motion Conference.  (Feb. 23, 2023 Min. Entry.) Thereafter, Plaintiffs filed the operative Amended Complaint on March 17, 2023.

### LEGAL STANDARD

### I.   Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  The Court reviews the operative Amended Complaint, "accept[ing] all factual allegations as true," for the purposes of Defendants' 12(b)(6) motion, and "draw[ing] all reasonable inferences in" Plaintiffs' favor. *Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021).  To the extent Plaintiffs allege "legal conclusion[s] couched as factual allegation[s]," however, the Court is not bound to accept such statements as true. *Drimal v. Tai*, 786 F.3d 219, 223 (2d Cir. 2015) (citing *Iqbal*, 556 U.S. at 678).

The Court must dismiss Plaintiffs' Amended Complaint if Plaintiffs have failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Iqbal*, 556
U.S. at 678.

## I.   Due Process

The Due Process Clause of the Fourteenth Amendment to the
U.S. Constitution dictates that "no State shall . . . deprive
any person of life, liberty, or property, without due process of
law."  U.S. Const. amend. XIV, § 1.  The Fifth Amendment
provides that "[n]o person shall be . . . deprived of life,
liberty, or property, without due process of law."  U.S. Const.
amend. V.  The Fifth Amendment Due Process Clause protects
against the actions of the federal government, whereas the
Fourteenth Amendment Due Process Clause protects against the
actions of state actors.  *See Darnell v. Pineiro*, 849 F.3d 17,
21 n.3 (2d Cir. 2017).  Both the Due Process Clause of the Fifth
Amendment and the Due Process Clause of the Fourteenth Amendment
were enacted "to prevent government 'from abusing its power, or
employing it as an instrument of oppression.'"  *DeShaney v.
Winnebago County Department of Social Services*, 489 U.S. 189,
195 (1989) (citing *Davidson v. Cannon*, 474 U.S. 344, 348
(1986)).

A plaintiff who alleges he or she has been deprived of the
right against "unjustified intrusions on personal security"
irrespective of any particular "procedural safeguard[]" invokes

11

the substantive component of the Due Process Clause, rather than procedural component. *DeShaney*, 489 U.S. at 195.  To state a substantive Due Process claim, Plaintiffs must allege (1) a constitutional right that Defendants infringed (2) by virtue of conduct that "shocks the [contemporary] conscience" or constitutes "a gross abuse of governmental authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 262-63 (2d Cir. 1999) ("Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.").

The measure of conduct that "shocks the conscience" is "no calibrated yard stick," but the Due Process guarantee cannot be interpreted to "impos[e] liability whenever someone cloaked with state authority causes harm." *County of Sacramento v. Lewis*, 523 U.S. 833, 847-48 (1998).  Intentionally inflicted injuries are the "most likely to rise to the conscience-shocking level" whereas negligently inflicted harm "is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849.  Where defendants are subject to "the pull of competing obligations," harm that is inflicted recklessly or with deliberate indifference likely does not shock the conscience. *Matican v. City of New York*, 524 F.3d 151, 159 (2d Cir. 2008) (citing *Lombardi v. Whitman*, 485 F.3d 73, 83 (2d Cir. 2007)).

Because the Due Process Clause of the Fourteenth Amendment

12

explicitly limits the states' power vis-à-vis individuals, the United States Supreme Court has repeatedly held that the Due Process Clause cannot be interpreted to create liability in connection with acts of violence perpetrated by private, non-state actors.  In *DeShaney*, the United States Supreme Court explained the limited applicability of the Due Process Clause to State actors, as follows:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

489 U.S. at 195.

The United States Supreme Court has affirmed this same reasoning time and time again.  *See Lewis*, 523 U.S. at 849 (The Due Process Clause "does not guarantee due care on the part of state officials"); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986) ("The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.")

The Second Circuit, however, recognizes limited exceptions

to the general rule that State actors may not be held liable
under the Due Process clause for the acts of private citizens.
The first exception involves circumstances where the government
maintains "a special relationship with an individual" such that
the State has "affirmative duties of care and protection." *Ying
Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993).
The second exception arises out of affirmative conduct by a
State actor that "create[s] or increase[s] the danger to the
individual" victim.  *Id.*  "[S]pecial relationship liability
arises from the relationship between the state and a particular
victim, whereas state created danger liability arises from the
relationship between the state and the private assailant." *Pena
v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005).

The first exception requires Plaintiffs to allege a
"special relationship" between the victim and State actor
whereby the State's "affirmative act of restraining the
individual's freedom to act on his own behalf" triggers the
protections of the Due Process Clause. *Deshaney*, 489 U.S. at
200.  Typically, the "restraint" that gives rise to a "special
relationship" relates to physical restraints on an individual in
a custodial setting where the State's "affirmative exercise of
power . . . renders [an individual] unable to care for himself
or herself[.]" *Id.*  But courts have also found special
relationships that have given rise to a governmental duty of

14

protection against third-person attacks in the context of a "relationship between a social service agency and foster child." *Ying Jing Gan*, 996 F.2d at 532 (internal citations omitted). Courts within the Second Circuit "focus[] on involuntary custody as the linchpin of any special relationship exception." *Matican*, 524 F.3d at 156 (citing *Lombardi*, 485 F.3d at 79 n.3).

The second exception, which is referred to as the "state created danger" exception, does not depend on the relationship between the victim and the State actors. *See Pena*, 432 F.3d at 113 n.22 (Under the "state created danger" exception, the fact that the victims were not in state custody at the time of [alleged incidents] is irrelevant.")[2]  Instead, under the "state created danger" exception, the government is liable for a Due Process violation where a State actor "affirmatively create[s] or enhance[s] the danger of private violence." *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 433 (2d Cir. 2009).  State created danger cannot be demonstrated by virtue of an "allegation simply that [] officers [] failed to act upon reports of past violence." *Id*.  Rather, the state actors must have "in some way assisted in creating or increasing the danger to the victim" in order to implicate the Due Process Clause. *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993).  In

---

[2] Unlike other Circuit courts, the Second Circuit "treats the 'state created danger' exception as distinct from the 'special relationship' exception.'" *Pena*, 432 F.3d at 113 n.22.

defining affirmative conduct, the Second Circuit has also held that "repeated, sustained inaction by government officials, in the face of potential acts of violence, might . . . ris[e] to the level of an affirmative condoning of private violence, even if there is no explicit approval." *Pena*, 432 F.3d at 111.

## II. 42 U.S.C. § 1983

In 42 U.S.C. § 1983, "Congress [] created a federal cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,'" by state actors. *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 755 (2005) (citing 42 U.S.C. § 1983). In order to state a claim under 42 U.S.C. § 1983, Plaintiffs must allege that they were (1) deprived of a constitutional right (2) by a person acting under the color of state law. *See* 42 U.S.C. § 1983. While the factors necessary to establish a § 1983 claim will vary depending on the constitutional provision at issue, Plaintiffs "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. It is long established law within the Second Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010).

### A. Qualified Immunity

16

State actors are "shielded from liability for civil damages [where] their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The threshold inquiry that a Court must determine when assessing a qualified immunity defense to an alleged violation of 42 U.S.C. § 1983 "is whether a plaintiff sufficiently alleges a deprivation of any right secured by the constitution." *Id*. If the Court finds that Plaintiffs have alleged a violation of a constitutional right, the Court must then "determine if the right was clearly established at the time of the defendants' behavior in issue." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In other words, the Court asks whether it would have been clear to a reasonable [official] that his [or her] conduct was unlawful in the situation." *Pena*, 432 F.3d at 114. "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id*. at 114 (internal citation omitted).

Typically, a qualified immunity defense cannot support dismissal of a case pursuant to Fed. R. Civ. P. 12(b)(6) unless "the facts supporting the defense appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435-36 (2d Cir. 2004). At the motion to dismiss stage, "a defendant presenting an immunity defense . . . must accept the more stringent

17

standard applicable to this procedural route" whereby "the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim." *Id.* at 436 (internal quotation marks and citation omitted).

### B. Monell Liability

Pursuant to the United States Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality is liable for a violation of 42 U.S.C. § 1983 where an "official municipal policy of some nature cause[s] a constitutional tort." *Monell*, 436 U.S. at 691. However, "a municipality cannot be held liable under 1983 on a *respondeat superior* theory." *Id.* at 691. The elements of a *Monell* claim for municipal liability are (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). An official municipal policy may be evidenced by "the decision[s] of . . . lawmakers, the acts of [] policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

### DISCUSSION

### I.   Plaintiffs' Constitutional Claims

As set forth previously, in order to state a substantive

Due Process claim, Plaintiffs must allege (1) a fundamental right that (2) Defendants infringed by virtue of conduct that "shocks the [contemporary] conscience" or constitutes "a gross abuse of governmental authority." *Natale*, 170 F.3d at 262-63.

At the outset, Plaintiffs' Amended Complaint purports to allege constitutional claims against state actors. Thus, the Court considers Plaintiffs claims only under the Fourteenth Amended Due Process Clause, which restricts the actions of state governments and officials. *See Darnell v. Pineiro*, 849 F.3d 17, 21 n.3 (2d Cir. 2017) ("[A] case implicates the Due Process Clause of the Fourteenth Amendment [where] it involves state [] detainees" whereas "claims brought by federal [] detainees [are brought] pursuant to the Due Process Clause of the Fifth Amendment."). In any event, the due process analysis under both Amendments is the same. *See Malinski v. New York*, 324 U.S. 401, 415 (1945) ("To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection.")

### A.   Constitutional Right

Plaintiffs first allege a constitutional right to "familial relationship and companionship" as between Mr. Eubanks and his sons, the Decedent and his Minor Son, and between the Decedent and the Minor Son, who are brothers. (AC ¶¶ 98-108.) Plaintiffs also allege a "right to life and liberty" (AC ¶¶ 109-

120), which corresponds to the Children's "right to safety and security . . . and [their] physical well-being."  (AC ¶ 61.) Both the right to life, as well as the right to maintain familial relationships, are recognized as constitutional rights protected under the Due Process Clause.  *See Patel v. Searles*, 305 F.3d 130, 137 (2d Cir. 2002) ("[C]onstitutional protections for associational interests are at their apogee when close family relationships are at issue.")

Plaintiffs, however, fail to allege that their constitutional rights were infringed upon by Defendants. Plaintiffs allege that Defendants deprived them of their constitutional rights by virtue of Defendants' failure to intervene by removing the Children from the custody of their mother and Mr. Johnson on August 26, 2021 and August 29, 2021, notwithstanding several indications that the Children were being abused, including a call from the Mandated Reporter, visible signs of physical injury, and information regarding Mr. Johnson's history of abuse.

As noted previously, however, "[a] State's failure to protect an individual against private violence generally does not constitute a violation of the Due Process Clause, because the Clause imposes no duty on the State to provide members of the general public with adequate protective services." *DeShaney*, 489 U.S. at 189.  Acts of violence perpetrated by a

private actor, such as Mr. Johnson's infliction of physical abuse on the Children, can only form the basis of a substantive Due Process claim where (1) "the state had a special relationship with the victim" or (2) the state actors "assisted in creating or increasing the danger to the victim." *Matican*, 524 F.3d at 155.  Even then, Plaintiffs must allege that Defendants' actions, as distinct from Mr. Johnson's actions, "shock the contemporary conscience." *Lewis*, 5235 U.S. at 847 n.8 (explaining that "in a due process challenge, . . . the [court must consider] whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.")  For the reasons set forth below, Plaintiffs fail to allege sufficient facts to state a Due Process claim under either exception.

### 1.  *Special Relationship*

In the Amended Complaint, Plaintiffs allege that Defendants "created a special duty to the Children."  (AC ¶¶ 100, 102, 112, 114, 124, 126 152.)  Plaintiffs contend that Defendants formed a special relationship with the Children by virtue of the Roe and Doe Defendants' interactions with the Children, Ms. Duvalle, and Mr. Johnson on August 26, 2021 and August 29, 2021, and specifically because of Defendants' promise to safeguard the Children from harm.  *See* (Ptf. Opp. at 19) ("[T]he Roe and Doe Defendants made explicit promises that they would protect the

21

Children").

The United States Supreme Court has explicitly rejected this exact argument. *See DeShaney*, 489 U.S. at 194 (the court "reject[s] the position . . . that once the State learns that a particular child is in danger of abuse from third parties and [] undertakes to protect [the child], a 'special relationship' arises between it and the child which imposes an affirmative constitutional duty to provide adequate protection.")  A special relationship only exists in circumstances of "incarceration, institutionalization," or where an individual is subject to "other similar restraint on [his or her] personal liberty."  *Id*. Neither "the State's knowledge of the [victim's] predicament or . . . its expressions of intent to help [the victim]" create a special relationship. *Jones v. Nickens*, 961 F. Supp. 2d 475, 487 (E.D.N.Y. 2013) (citing *DeShaney* 489 U.S. at 199-200) (Defendants' "pledge[] to help correct the danger of abuse that the decedent faced" does not constitute a "special relationship").  Though the Amended Complaint makes repeated reference to the creation of "a special duty," Plaintiffs do not allege facts that Defendants imposed any restraint on the Children's personal liberty or otherwise created a special relationship.  Nor do Plaintiffs allege that the Children were ever in State custody during any of the instances of abuse.  To the contrary, Plaintiffs allege that the Children were in the

care of Ms. Duvalle and Mr. Johnson at the time that they
sustained grievous bodily injuries. *See Nickens*, 961 F. Supp.
2d at 487 ("Because the harms the child suffered occurred while
he was in [a private actor's] custody, rather than in the
custody of the State, there was no such 'deprivation of liberty'
triggering the protections of the Due Process Clause.") (citing
*DeShaney*, 489 U.S. at 201).

Accordingly, Plaintiffs fail to assert sufficient factual
allegations that the Children and Defendants shared in a special
relationship that triggered an affirmative duty to intervene.

### 2.   *State-Created Danger*

Plaintiffs also allege that Defendants engaged in
affirmative conduct, which "creat[ed] and/or increas[ed] the
danger to the Children." (AC ¶¶ 60, 78, 99, 110, 111, 122, 123,
141.)  In support of this allegation, Plaintiffs point out that
Defendants (1) brought the Children, Ms. Duvalle, and Mr.
Johnson to the ACS office in Brooklyn, New York for interviews;
(2) questioned the Children, Ms. Duvalle, and Mr. Johnson; (3)
observed physical injuries sustained by the Children; (4)
learned and knew of Mr. Johnson's history of child abuse,
including an outstanding warrant; and (5) made two home visits,
at which Ms. Duvalle, Mr. Johnson, and the Children were
present, and after which they discharged the Children into the
care and supervision of Ms. Duvalle and Mr. Johnson.  (AC ¶ 51.)

Plaintiffs do not allege that Defendants had information that Ms. Duvalle and/or Mr. Johnson caused injuries to the Children. Plaintiffs contend that by failing to intervene on August 26, 2021 and August 29, 2021, the Doe and Roe Defendants "implicitly – and/or explicitly – communicated to Mr. Johnson that Defendants [would] not interfere, arrest, or punish him for his abuse . . . and/or [that] he [could] continue to attack, injure, and abuse the Children with impunity."  (AC ¶ 50.)

However, Plaintiffs allegations do not rise to the level of state created danger alleged in any case where a Due Process violation was recognized by the Second Circuit under the state created danger exception.  Plaintiffs do not allege that Defendants ever told Mr. Johnson that he could act with impunity or assured Mr. Johnson that he would "not be impeded or arrested."  *Dwares*, 985 F.2d at 99; *see also Snider v. Dylag*, 188 F.3d 51, 55 (2d Cir. 1999) (Defendants told the private actor that it was "open season" on the victim, whereupon the private actor proceeded to assault the victim).  Nor do Plaintiffs allege that Defendants declined to arrest Mr. Johnson, nor that Mr. Johnson or Ms. Duvalle explicitly admitted that Mr. Johnson was abusing the Children, nor that Defendants "openly expressed camaraderie with [Mr. Johnson] and contempt for [the Children]" in the face of such an admission.  *Okin*, 577 F.3d at 430 (finding that defendants "actually contributed to

the vulnerability of [the victim]" such that the victim was "safer before the state action than . . . after it.") (citing *Koulta v. Merciez*, 477 F.3d 442, 446 (6th Cir. 2000)).  Neither do Plaintiffs allege that Defendants provided Mr. Johnson with the physical means to abuse the Children as in *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998) ("Officers conspired . . . with [the private actor] by giving a 9 mm Glock handgun to [the private actor] who shot [Plaintiff] several times.") Plaintiffs also do not allege that Defendants "participated in or condoned [Mr. Johnson's] behavior" by "routinely" engaging in the abusive conduct alongside Mr. Johnson or by repeatedly "condoning the misconduct" over the course of several months. *Pena*, 432 F.3d at 110-11 ("several of the defendants . . . [engaged in misconduct] with [the private actor]" on a "routine[]" basis, and facilitated the misconduct on the day of the alleged incident, including by "asking [the private actor] to" engage in knowingly unlawful conduct).

Finally, Plaintiffs allegations are not in any way similar to the facts alleged in *Matican*, a case upon which Plaintiffs rely, wherein the Second Circuit found that the "plaintiff's allegation that the officers planned [a] sting in a manner that would lead [the private actor] to learn about [the plaintiff's involvement [was] sufficiently affirmative to qualify as a state-created danger." *Matican*, 524 F.3d at 158.

Instead, Plaintiffs argue that Defendants' office interview
and two home visits with the Children, their mother, and Mr.
Johnson amounted to "do[ing] nothing" to intervene on August 26,
2021 and August 29, 2021 and that by allowing the Children to
continue living with their mother and Mr. Johnson, Defendants
communicated to Mr. Johnson that his conduct was permissible.
"There is no plausible allegation that Defendants somehow
conveyed [] implicit encouragement of child abuse" under these
circumstances.  *Hendricks v. City of New York*, No. 13-cv-2787,
2014 WL 3819296, at *4 (S.D.N.Y. Aug. 4, 3014).  Though
Defendants had knowledge that Mr. Johnson had a prior record of
child abuse, Plaintiffs do not allege that Defendants had gained
knowledge that Mr. Johnson had physically harmed the Children.
Instead, Plaintiffs argue that "a failure to interfere when
[evidence of past] misconduct" is apparent is itself an implicit
encouragement of that misconduct.  This argument collapses the
distinction between a state-created danger, which may constitute
a basis for a Due Process claim, and a failure to intervene,
which does not.  *Matican*, 524 F.3d at 157 (the Second Circuit
has "sought to tread a fine line between conduct that is passive
(and therefore outside the exception) and that which is
affirmative (and therefore covered by the exception).")
(internal quotation marks and citation omitted).  Moreover,
Plaintiffs' position has been explicitly rejected by the United

States Supreme Court and the Second Circuit. *Id.* at 157 ("while the State may have been aware of the dangers that [plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.") (citing *DeShaney*, 489 U.S. at 201).  The factual allegations in the Amended Complaint, construed "as favorably as possible for Plaintiff[s]," are insufficient to establish the state created danger exception and amount to no more than an assertion that "[Defendants] stood by and did nothing despite assuring [the Children] that they would protect [them] from a known danger."  *Tufaro v. City of New York*, No. 12-cv-7505 (AJN), 2014 WL 4290631, at *4 (S.D.N.Y. Aug. 28, 2014) (finding such conduct "passive" and "insufficient to state a claim under Section 1983.") (citing *Matican*, 524 F.3d at 157-58).  Accordingly, Plaintiffs fail to assert sufficient factual allegations that Defendants' conduct posed a state-created danger to the Children, such that Defendants had an affirmative duty to intervene.

Plaintiffs did not have an affirmative right to government protection under the Due Process Clause because Plaintiffs failed to adequately allege either that the Children had a special relationship with Defendants or that the Children faced a state-created danger.  In this circumstance, Defendants' failure to remove the Children from the custody of their mother

27

and Mr. Johnson resulted in tragic circumstances, but did not violate the Due Process Clause.  *See DeShaney*, 489 U.S. at 196 ("[T]he Due Process Clauses generally confer no affirmative right to government aid, even where such aid may be necessary to secure life, liberty or property.")

**B. Shocks the Conscience**

Having determined that Plaintiffs failed to adequately allege that Defendants violated Plaintiffs' constitutional rights, the Court need not examine whether Defendants' conduct was "so egregious [and] so outrageous, that it may fairly be said to shock the contemporary conscience." *Okin*, 577 F.3d at 431 (citing *Lewis*, 523 U.S. at 847 n.8.)  In any event, Plaintiff fails to allege conduct by Defendants, as opposed to Mr. Johnson, that rises "to the conscience-shocking level." *Matican*, 524 U.S. at 159.

Plaintiff alleges that Defendants engaged in "gross negligence, reckless conduct, and deliberate indifference."  (AC ¶ 64.)  Plaintiffs, however, do not identify or explain what conduct is allegedly shocking to the conscience.  Plaintiffs only state that "the Court . . . must find that a reasonable, contemporary factfinder would conclude that Defendants' conduct offends 'decencies of civilized conduct.'"  (Ptf. Opp. at 14) (citing *Rochin v. California*, 342 U.S. 165, 1173 (1952)).  Putting aside Plaintiffs' misstatement of the applicable

28

standard of review, the Amended Complaint does not allege facts
from which the Court can infer that Defendants engaged in
conduct which shocks the contemporary conscience.[3]   This
requirement that an alleged violation of a plaintiff's Due
Process rights must shock the conscience "preserve[s] the
constitutional proportions of constitutional claims, lest the
Constitution be demoted to . . . a font of tort law."  *Lewis*,
523 U.S. at 847 n.8.  Plaintiffs do not contend that Defendants'
conduct "was arbitrary or irrational or motivated by bad faith."
*Rosa v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989).  Indeed,
Plaintiffs repeatedly allege that Defendants "negligently failed
to provide for the safety, security and protection of the
Children."  *See* (AC ¶¶ 6, 43, 45, 72 103, 104, 106, 115, 116,
118, 127, 128, 130, 153-156.)  Plaintiffs also assert a tort law
claim sounding in negligence under New York state law.  (AC ¶¶
151-61.)  However, "negligently inflicted harm is categorically
beneath the threshold of constitutional due process."  *Lewis*,
523 U.S. at 849.

Plaintiffs' allegations of deliberate indifference also
cannot fairly be said to shock the contemporary conscience."  It

---

[3] As set forth previously, in considering a motion to dismiss under Fed. R.
Civ. P. 12(b)(6), the Court "accepts all factual allegations as true," and
"draws all reasonable inferences in" Plaintiffs' favor.  *Melendez*, 16 F.4th
at 1010. Plaintiffs' statement regarding what "a reasonable, contemporary
factfinder would conclude" relates to the standard of review for a summary
judgment motion under Fed. R. Civ. P. 56.

is "[Defendants'] actions themselves [that] must 'shock the contemporary conscience'; it is not enough that [Mr. Johnson's] actions would meet that standard." *Zubko-Valva v. County of Suffolk*, 607 F. Supp. 3d 301, 310 (E.D.N.Y. 2022) (reiterating that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause even if state actors may have been aware of the dangers that the individual faced from specific private actors.") (citing *DeShaney*, 489 U.S. at 197).  Defendants' failure to intervene in the course of interviewing and questioning the Children, Ms. Duvalle, and Mr. Johnson, Defendants' promises to protect the Children, Defendants' failure to act on evidence of Mr. Johnson's past criminal history, including his outstanding warrant, and Defendants' failure to respond to visible signs of abuse resulted in tragic consequences for the Children.  The Decedent's death and the abuse sustained by the Children is heartbreaking.  Nevertheless, "the Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the States," and Plaintiffs do not state plausible facts that Defendants' conduct rises to the level of "constitutional proportions." *Lewis*, 523 U.S. at 848 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).  Moreover, as in *Matican*, this Court is "loathe to dictate to the police [or to ACS] how best to protect

. . . the public." *Matican*, 524 U.S. at 159.  Accordingly, Plaintiffs fail to allege conduct that shocks the contemporary conscience.

## II.  42 U.S.C. § 1983 Liability

If a court concludes, as this Court does here, that Plaintiffs have failed to state a claim that they were deprived of a constitutional right by Defendants, "the Court [has] no occasion to consider whether the individual [Defendants] might be entitled to a qualified immunity defense, or whether the allegations in the complaint are sufficient to support a § 1983 claim against the [municipality] under *Monell* . . . and its progeny." *DeShaney*, 489 U.S. at 202 n.10 (internal citations omitted).  Indeed, under the qualified immunity test, if Plaintiffs fail to allege facts demonstrating a constitutional violation under the first prong, the Court certainly cannot find that the alleged "right was clearly established at the time of the alleged conduct" under the second prong.  *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

In any event, "[i]t is well settled that child protective services workers are entitled to qualified immunity for their

conduct during the course of abuse investigations." *Wilkinson v. Russell*, 182 F.3d 89, 99 (2d Cir. 1999) (internal citations omitted).  This is because the "decision to remove a child from parental custody . . . obliges protective services caseworks to choose between difficult alternatives in the context of suspected child abuse." *Van Emrik v. Chemung County Department of Social Services*, 911 F.2d 863, 866 (2d Cir. 1990).  In one scenario, state actors "may be accused of infringing the parents' constitutional rights" and in the other scenario, state actors may be accused of "infringing the child's rights. . . . It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives[.]" *Id.* at 866 (finding that defendants' conduct was not "objectively [un]reasonable" even in the face of visible injury and an "attending physician's . . . suspicion[n] of child abuse.") Accordingly, Plaintiffs fail to allege a violation of a constitutional right and, by extension, that any alleged right was clearly established at the time of Defendants' alleged inaction or affirmative conduct.

Similarly, where a plaintiff's "due process claims fails," the Court need not "reach [the plaintiff's] *Monell*" claim. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (If "the district court properly [finds] no underlying constitutional violation, its decision not to address the

municipal defendants' liability under *Monell* [is] entirely correct.")  This is because "a *Monell* claim cannot succeed without an independent constitutional violation." *Anilao v. Spota*, 27 F.4th 855, 874 (2d Cir. 2022) (*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability . . . where that organizations' failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original) (internal citation omitted). As discussed, the Amended Complaint fails to allege a constitutional violation.

Moreover, Plaintiffs' allegation that the City maintains a policy, practice, and custom of endangering vulnerable children by ignoring complaints of child abuse as a result of inadequate training is insufficient to state a claim for *Monell* liability. The United States Supreme Court has recognized limited circumstances where a municipality's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by itself to violate the Constitution." *Connick*, 563 U.S. at 61. However, Plaintiffs do not allege such notice. *See id*. at 61. ("Without notice" that a municipality is engaged in a pattern or practice of violating individuals' constitutional rights, "decisionmakers can hardly be said to have deliberately chosen .

33

. . [to] violat[e] [individuals'] constitutional rights.")
Neither have Plaintiffs alleged that the City's inadequate
structure, including personnel, rises to the level of a
"practice[] so persistent and widespread as to practically have
the force of law." *Id.* "[T]he Due Process Clause . . . is not
a guarantee against incorrect or ill-advised personnel
decisions" and this Court "is not the appropriate forum in which
to review the multitude of personnel decisions that are made
daily by public agencies." *Bishop v. Wood,* 426 U.S. 341, 350
(1976).

Accordingly, Plaintiffs' failure to allege an underlying
individual constitutional violation or to allege a practice of
constitutional violations is fatal to Plaintiffs' *Monell* claim.

**III. Plaintiffs' Remaining State Law Claims**

"If [Plaintiffs] ha[ve] no valid claim under [42 U.S.C. §]
1983 against any defendant, it is within the district court's
discretion to decline to exercise supplemental jurisdiction over
the pendent state-law claims." *Matican*, 524 F.3d at 155.
Indeed, because Plaintiffs have failed to allege a viable
federal claim, it would "exceed [the] allowable discretion" of
the Court to assert supplemental jurisdiction. *Id*. at 159.

Here, Plaintiffs' federal claims will have been dismissed
well in advance of any trial, discovery has not proceeded, and
the parties have not articulated any federal interest in

resolving Plaintiffs' state law claims.  Accordingly, the Court
finds that this is "the usual case" where the balance of
factors, including "judicial economy, convenience, fairness, and
comity . . . point toward declining to exercise jurisdiction
over the remaining state law claims." *Carnegie-Mellon
University v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also
United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726
(1966) ("[n]eedless decisions of state law should be avoided
both as a matter of comity and to promote justice between the
parties, by procuring for them a surer-footed reading of
applicable law.")

The Court declines to exercise supplemental jurisdiction in
light of its decision to dismiss Plaintiffs' federal claims.
Plaintiffs' state law claims are hereby dismissed without
prejudice and with leave to refile in New York state court.

### CONCLUSION

For the reasons set forth in this Memorandum and Order,
Defendants' motion to dismiss Plaintiffs' Amended Complaint is
hereby **GRANTED**.  The Amended Complaint is **DISMISSED** without
prejudice and with leave to refile Plaintiffs' state law claims
in New York state court.

Federal Rule of Civil Procedure 15(a) dictates that leave
to amend a complaint shall be freely given "when justice so
requires."  Although the Second Circuit has advised that "the

usual practice upon granting a motion to dismiss [is] to allow leave to replead," *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), Plaintiffs have already been granted leave to amend the Complaint. *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) ("leave to amend, though liberally granted, may properly be denied for . . . failure to cure deficiencies by amendments previously allowed") (internal citations omitted). Moreover, Plaintiffs "can plead no facts that would overcome the legal [and factual] deficiencies discussed above," as it relates to Plaintiffs' Due Process claim. *Johnson v. Maximus Services LLC*, No. 22-cv-2935 (AMD), 2023 WL 5612826, at *6 (E.D.N.Y. Aug. 30, 2023). As such, the Court will not grant further leave to amend Plaintiffs' federal claims.

The Clerk of Court is respectfully requested to enter judgement and close this case.

**SO ORDERED.**

Dated:       March 26, 2024
             Brooklyn, New York

_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York